James Owings *vs.* William Baldwin and George Whee-
ler.—*December,* 1849.

*B* and *W* made a parol contract with *O*, for the purchase of certain lands,
upon certain terms; upon the compliance with which, on the part of the
vendees, the vendor was to give a sufficient deed for the property. HELD:
that under this contract, the vendees had a right to demand, and were bound
to accept nothing short of an unincumbered legal estate, in fee.

If the contract is general, it amounts to an undertaking for the conveyance
of a legal title, and if the vendor has but an equitable title, the contract is
not binding upon the vendee, at law nor in equity, if the vendor cannot
procure the legal title.

A specific performance of a contract for the sale of lands, will not be decreed
on the application of the vendor, unless his ability to make such a title as
he has agreed to make, be unquestionable.

Part of the land sold under the above contract, was conveyed, in 1799, to *O*
and *P*, as joint tenants, in fee. In April, 1818, *P* sold his interest therein
to *O*, to whom he gave a paper, signed by himself, and attested by two wit-
nesses, stating that he agreed to take $5,000 for his interest in said proper-
ty, "which is now bound by a judgment held by *O*, and under execution
for the same." The witnesses to this paper prove, that it was agreed be-
tween *O* and *P* to credit the $5,000 on the judgment held by *O*, which was
then done in *P*'s presence. Possession was shortly afterwards delivered to
*O*, who, with those claiming under him, has held uninterrupted and undis-
puted possession of the property until 1845, the date of the sale to appel-
lees. *P* survived *O*, and died in 1826, never having executed a deed for
the property to the latter, who died in 1819. In May, 1818, *O* sold the pro-
perty to *B*, and executed a bond of conveyance, but no deed therefor. *B*
took and remained in possession until 1830, when the executors of *O*, hav-
ing recovered judgment against *B*, for the balance of the purchase money
due by him, issued executions, under which the property was sold and con-
veyed by the sheriff to the appellant, who, in 1846, contracted to sell it to
the appellees. HELD:

That this title of the appellant, thus offered, was not sufficient to authorise a
court of equity to decree a specific performance of the contract made with
the appellees, and compel them to accept the title of the vendor in this
condition.

The title of the appellant depending, in a great measure, upon the individual
knowledge of the attesting witnesses to this paper, one of whom is already
dead, and the duration of this proof being precarious, and the appellant
having filed a bill against the heirs of *P*, to perfect his title at law, which
bill he dismissed, and the records of the court showing no entry of the
credit on the judgments against *P*, a court of equity having a due regard

to the claims which might arise from the heirs of *P*, upon the death of the remaining attesting witnesses, would not compel the appellees to accept this title.

*B* filed a bill claiming the land, under his contract of May, 1818, and impeaching the validity of the sale by the sheriff. The answers to this bill swore away all its equity, and were supported by proof. HELD: that the pendency of this suit, under such circumstances, was not a sufficient ground for a court of equity to refuse to compel the appellants to execute their contract.

The mere commencement of a suit for the recovery of the whole or a part of the land sold, after the filing of a bill for the specific execution of the contract of sale, is not, of itself, sufficient to prevent the vendee's being decreed to accept the title, provided it appears, to the satisfaction of the court, that the suit so commenced cannot be successfully prosecuted.

The appellant having purchased, at sheriff's sale, the interest of *B*, under his bond of conveyance, which was a mere equitable title, subject to a lien for the balance of the purchase money due by *B*, and this being the only title he professed to have, the appellees were not bound to accept it.

Where the statute of frauds is relied on in the answer, as a bar to a specific execution of a parol contract, it can only be evaded by full proof of the acts of part performance charged in the bill.

Where possession of lands was delivered, not under the contract sought to be enforced, but another subsidiary agreement, the original contract still remaining unrescinded, it will not remove the bar of the statute.

Appeal from the *Court of Chancery*.

The bill in this case was filed on the 20th of May, 1846, by the appellant, against the appellees, for a specific execution of a parol agreement for the purchase of a parcel of land, with the improvements thereon, consisting in part of a factory called *Guilford* factory, which, the bill alleges, the appellees agreed verbally to purchase of the complainant, some time in the spring of 1845, for the sum of $20,000, of which $5,000 was to be paid on delivery of possession, and, within twelve months thereafter, the sum of $1,666.66⅔, with interest on the unpaid balance, and the residue in three equal instalments, in five, ten, and fifteen years, with the privilege to the purchasers of paying the purchase money within the times before limited; possession to be delivered on the 1st of June, 1845.

The bill states, that no agreement note or memorandum of agreement for said purchase, in writing, was ever signed by the

defendants, or either of them, or their agent, and delivered to the complainant, but that, pending negotiations for the purchase, the complainant reduced to writing the terms on which he would sell, which terms were exhibited to and accepted by defendants, and this memorandum is filed as an exhibit with the bill. That on the 1st of June, 1845, complainant delivered, and defendants received, full possession of the premises, according to the form and effect of said agreement, and thenceforth continually have been, and now are, in the free and undisturbed possession and enjoyment thereof. The bill then charges that defendants have wholly neglected and refused to comply with this contract, sometimes pretending that they desired time and opportunity to examine complainant's title to the premises; all the particulars of which, he avers he has been at all times willing to communicate freely, and has submitted his title to the counsel of the defendants, and has paid said counsel for procuring a deed to cure the only defect said counsel supposed to exist in said title, and independent of the usual evidences of title, complainant avers he may well rely on the possession, continued and undisturbed, and adverse against all the world, which he, and those under whom he claims, have had of said premises, for more than twenty years next preceding the delivery of possession thereof, as aforesaid, so that all such pretences of the defendants are wholly groundless. The prayer is, that said agreement may be decreed to be specifically executed, and for general relief.

Exhibit A, filed with the bill, and admitted by the answer, is as follows:

"The property which I offer for sale, is my factory, known by the name of *Guilford*, with all the machinery now in the same, and all my lands adjoining, which I purchased, at sale, from *Richard Iglehart*, late sheriff of *Anne Arundel* county, with all the buildings and improvements on the same, reserving all the granite that has been gotten out by stone cutters, which they must have the privilege of removing as soon as they can make it convenient to do so, not more than three months. I also reserve, for the use of *Mr. Woods,* the house and garden

he now occupies, till the 1st of July next. Should the property be sold, the goods in the store to be taken by the purchaser at prices to be agreed on. Possession to be given on 1st of June next. The price is $20,000, one-third cash; say cash on delivery of possession, $5,000, and within twelve months, $1,666⅔, with interest on the unpaid balance, $13,333.68, to be in equal payments of one-third each, five, ten, and fifteen years. Interest on the unpaid balance to be paid yearly; the property to be kept insured to amount of $10,000, on account of said *Owings,* till it may be paid for. The purchaser to have the privilege of paying within the time named. When the whole of the money is paid, *J. O.* agrees to give a sufficient deed for the same. The crops growing on the land, subject to the contract made by *H. H. Owings,* with the tillers of the land for the present year."

On the 4th of June, 1846, the complainant filed a petition, stating that he had been informed that defendants were taking steps to suspend the operations of the factory, and had resolved to abandon, entirely, the said premises, and praying that a receiver might be appointed to take charge of the same, and rent it out for some short time, on such terms as he may deem expedient; and, by an agreement of the parties, the chancellor, on the 29th of June, 1846, appointed a receiver, as prayed, without prejudice to any question of right.

The answer of the defendants, *Baldwin* and *Wheeler,* requires the production of deeds, and full proof of the title of the complainant in the lands in controversy. It admits, that in the spring of 1845, defendants, being desirous of purchasing the said factory and lands adjoining, of which complainant claimed to be the owner, entered into negotiation with him for that purpose, in the course of which he handed to respondents the paper as above set forth, as an offer of the terms on which complainant was willing to sell said property; which paper respondents received, that they might consider and deliberate on the offer therein contained. They deny that they received or accepted it as a memorandum or evidence of any contract or agreement whatsoever, which they absolutely deny having

made. That the terms contained in said paper being in several respects objectionable, they, in their turn, prepared a paper which they exhibit, and which they allege they presented to the complainant as the only form in which they would agree to consider the offer of the complainant, and on which they would agree to contract for the property, when they should be satisfied in regard to the title. That the complainant, upon seeing this paper, agreed that defendants should retain it, and consider it as his offer to them. That after this, and before any agreement had been made, and before they took possession of the property, they were willing to accede to said offer, and make the cash payment, and comply with the other stipulations in the last mentioned offer, when and so soon as they should be satisfied of the title of the complainant; but they explicitly deny that they then were, or have since been, satisfied with the title, or that, at any time, they have made an agreement, verbally or in writing, for the purchase of the property. The answer then proceeds to state, that upon an examination of the complainant's title, it was found to be defective; but, that being desirous to commence operations, they requested their counsel to see complainant, and make with him some temporary arrangements for the possession of the factory, whilst the objections to the title were examined, and, if possible, removed. That this was done, and the consent of the complainant obtained, that defendants might take possession and hold the same until the title could be investigated, and that for the use and occupation of the property, the defendants were to be chargeable only with the interest on the sum of $15,000, the amount of the deferred payments. That they accordingly took possession on the 2nd of June, 1845, not as purchasers or in part performance of any contract of purchase made or agreed upon, as charged in the bill.

The answer then proceeds to specify the defects in the title:

1st. That the deed of *Richard Odle* to *Richard Owings* and *Isaac Paul*, referred to in the bill, but not produced, granted the lands thereby conveyed to said *Owings* and *Paul*, as tenants in common, and said *Paul* having died many years since,

leaving infant heirs, some of whom are married women, and non-residents, defendants required some sufficient evidence that the title vested in said *Paul*, by said deed, had passed to complainant; that a deed was accordingly prepared to be executed by the heirs of said *Paul*, relinquishing all their claim and title to said property, which deed said heirs, or some of them, refused to execute; that complainant then filed a bill in chancery, to compel a conveyance from said heirs, which is still pending and undetermined; that as to the twenty years' adverse possession set up in the bill, they know nothing, except by hearsay, and required proof of such possession, as would bar the said *Paul* and his heirs, and of the origin and circumstances of any possession adverse to said *Paul* and his heirs.

2nd. That many years ago, a certain *Zachariah Poulton,* who is still alive, was put in possession of said property under some contract with said *Richard Owings,* and he now sets up some claim or right to said property, and threatens to file, or has filed, a bill in equity against said complainant, to enforce his supposed rights, and respondents required full and satisfactory explanation and denial of this claim.

The answer then further states, that after considerable delay on the part of complainant, in satisfying defendants, or their counsel, in regard to the title, and after repeated warnings that they could not consent to become purchasers, unless they were satisfied upon the subject, and their objections remaining unremoved, they, on the 1st of June, 1846, abandoned the possession of the property, after previous reasonable notice had been given complainant of their design to do so; and after again, in the most direct terms, denying that defendants took possession in part performance of any agreement or contract of purchase, relies upon the statute of frauds as a defence to the relief prayed by the bill. The answer also urges the alleged defects in complainant's title as cause against a decree for specific performance; and further insists, that though they did hold the possession, and enjoy the use of the property for a year, under the temporary arrangement before mentioned, and that if the complainant is entitled to recover the interest as stipulated from them,

for such occupation and use, he is not so entitled in the present proceedings: *first*, because he makes no such claim in his bill, and *secondly*, because, in respect to any such demand, he has adequate remedy at law.

The paper referred to in this answer, and exhibited with it, is as follows:

"The property which I offer for sale, is my factory, known by name of *Guilford*, with all the machinery now in the same, and all lands adjoining, which I purchased at sale from *Richard Iglehart*, late sheriff of *Anne Arundel* county, with all the buildings and improvements on the same, reserving all the granite that has been gotten out by stone cutters, which they must have the privilege of removing within three months from 1st of June, 1845. I also reserve for the use of *Mr. Woods*, the house and garden tract now occupied, until 1st of July next, should the property be sold.

"Possession to be given on 1st of June next. The price is $20,000, one-third in cash; say in cash, on delivery of possession, 5,000, and within twelve months, $1,666⅔, with interest on the unpaid balance, $13,333.66, to be in equal payments of one-third each, five, ten and fifteen years. Interest on the unpaid to be paid yearly. The property to be kept insured to amount of $8,000, on account of said *Owings*, till it may be paid for. The purchasers to have the privilege of paying up any time within the time named, when whole money is paid.

J. O."

The proceedings in the case of *Poulton vs. Iglehart and Owings*, introduced into the record, show that said *Poulton* filed his bill against *Samuel Owings* and *James Owings*, executors of *Richard Owings*, deceased, and *Richard Iglehart*, Sheriff of *Anne Arundel* county, on the 29th of June, 1847, charging, that in the year 1818, said *Richard Owings*, falsely pretending that he was the owner of the *Guilford* mills, and adjoining lands, induced complainant to purchase them for the sum of $11,200, for which amounts he gave his several promissory notes to said *Owings*, who, at the same time, executed a bond of conveyance (which is exhibited with the bill,) to com-

plainant for said land, upon payment of said notes. That said
*Owings* delivered possession of the mill and lands to complain-
ant, who paid to said *Richard Owings*, in his lifetime, and to
*James Owings*, one of his executors, since his death, the said
notes, as they became due, to the amount of $7,000, but fail-
ing to pay two of his notes, the said *James Owings*, executor
as aforesaid, with *Richard Iglehart*, sheriff, as aforesaid, about
the 9th of July, 1830, took possession of said mill and premises,
and wrongfully and fraudulently dispossessed complainant, pre-
tending that the same had been sold to said *James Owings*,
under writs of *fi. fa.* upon judgments against complainant, at
suit of the executors of said *Richard Owings*. That com-
plainant being, at that time, feeble in body, and weak in mind,
and wholly unable to attend to his affairs, quietly suffered this
dispossession, and has continued so dispossessed up to the present
time. The bill then alleges, that said *James Owings*, finding
he had no title to said property, under any proceedings against
complainant, filed a bill in chancery against the heirs of said
*Isaac Paul*, against whom he alleges he has an equitable claim.
The prayer of the bill is, that said executors may be decreed
to account with complainant for the rents and profits of the
mill and lands since he has been so dispossessed thereof, and
if they cannot show a sufficient title in *Richard Owings*, de-
ceased, to execute his bond of conveyance, then that the money
complainant has paid on his said purchase, may be refunded to
him, and if a sufficient title be hereafter procured, that they
may be decreed to convey said property to complainant, in pur-
suance of said bond of conveyance, and for general relief.

The bond of conveyance from *Richard Owings*, exhibited
with this bill, is in the usual form, reciting the purchase by
*Poulton*, as charged in the bill, and the execution of the pro-
missory notes, and is dated the 9th of May, 1818.

The answer of *James Owings* to this bill, after admitting
the agreement for purchase, and the execution of the bond of
conveyance as charged in the bill, avers, that *Richard Owings*,
at the time this bond was executed, was in possession of the
premises, and entitled thereto, and fully authorised to sell the

same. That said premises, many years before that time, had been owned and possessed by said *Richard Owings* and one *Isaac Paul*, as co-partners, or tenants in common. That said *Richard* afterwards sold all his interest in said premises to said *Paul*, for a large sum of money, to be paid at a then future day. That this purchase money was not paid at the day, and said *Richard* having recovered judgment therefor, against said *Paul*, and having issued and levied his execution on said premises, it was agreed between said parties, that said *Paul* should sell all his interest in the aforesaid premises to said *Owings*, for the sum of $5,000, to be credited on the judgment. That this credit was allowed, and said *Paul* actually surrendered possession of said premises to *Owings*. That this agreement was entered into in the month of April, 1818, and that said *Owings*, and those claiming under him, have ever since possessed and enjoyed said premises as their own absolute estate, without any claim, let, or molestation on the part of said *Paul*, or any person claiming under him. That defendant is advised and insists, that after such long and continuous possession of the premises, it will be presumed that the title and interest of said *Paul* therein, were duly conveyed unto said *Richard Owings*, in execution of said agreement.

That full and entire possession of the premises was delivered by the said *Richard Owings* to complainant, shortly after the execution of said bond of conveyance, and the complainant held and enjoyed such possession, quietly, until the year 1830, when he freely and voluntarily surrendered the possession to this defendant, under the following circumstances: Defendant and his co-executor recovered judgment on two of complainant's promissory notes, upon which executions were issued, and placed in the hands of *Richard Iglehart*, sheriff of *Anne Arundel* county, in which said judgments were recovered, who, in virtue thereof, seized said premises and duly sold the same to this defendant, on or about the 9th of June, 1830, for a large sum of money, which defendant has fully paid and satisfied. That complainant was present at said sale, and acquiesced therein, making no objection whatever to the regularity there-

44    v.8

of, and shortly thereafter, freely abandoned the possession thereof to defendant, who held the same without objection on the part of complainant, from that time until the year 1846. The answer denies that complainant was feeble in body, or weak in mind, as charged in the bill, and avers that defendant, relying on the title thus acquired, has made large and extensive improvements on said premises, and insists that he is to be treated as a purchaser for a valuable consideration, without notice of complainant's pretended claim. The answer further says, that in the year 1845, defendant agreed to sell said premises to *Baldwin* and *Wheeler*, when it was discovered that no conveyance had passed from said *Paul* to *Richard Owings*, and to obviate this objection, defendant, contrary to the advice of his own counsel, who expressed an opinion, that, under the circumstances, a conveyance from said *Paul* would be presumed, caused a bill to be filed against the heirs at law of said *Paul*, for a conveyance of his interest in said premises; that the effort to obtain this conveyance, being attended with more expense than was at first anticipated, he caused said bill to be dismissed. The defendant further insists, that there is yet due from complainant a large amount on his notes to said *Richard Owings*, which he ought to be required to pay, before obtaining any relief.

The answer of *Samuel Owings*, the other executor, adopts that of his co-defendant, *James*, and that of *Richard Iglehart* simply asserts, that he sold the premises to *James Owings*, as stated in the answer of the latter, and has executed a deed therefor to the purchaser.

The proof taken under the commission, shows: 1st. In reference to the title of *Richard Owings* in the premises in question, a deed from *James Carey*, dated 7th of October, 1799, conveying the *Guilford* mills to said *Richard Owings*, in fee, for the consideration of £1,200. Another from *Richard Odle*, dated 24th of May, 1799, conveying to *Richard Owings* and *Isaac Paul* the adjoining lands, containing one hundred and twenty-seven acres, for the consideration of £300. Also the agreement of *Isaac Paul*, recited in the opinion, dated 20th of

April, 1818, with the testimony of *Samuel Brown, Jr.,* and *Basil Owings,* the attesting witnesses thereto, "that the property in question was about to be sold under execution, at suit of *Richard Owings,* against said *Paul,* when the agreement was made, that *Owings* was to give *Paul* $5,000 for the property, which amount was to be credited upon judgments which *Owings* had against *Paul.* *Brown* was security for *Paul,* and paid the balance due on the judgments, and the $5,000 was credited. Possession was delivered shortly after this agreement. This agreement was to pass all the interest of *Paul* in the premises. 2nd. As to the title of the complainant, *Jas. Owings,* a deed from *Richard Iglehart,* sheriff, dated 3rd of June, 1845, conveying to said *James Owings* the whole property in question, taken in execution and sold under writs of *fi. fa.* issued against *Zachariah Poulton;* and another deed from the same party, dated 17th of March, 1846, executed for the purpose of curing certain defects in the original deed; also proof sustaining the answer of said *James Owings* to the bill of *Poulton.* 3rd. As to the agreement charged in the bill of *Owings,* and the possession of the appellees of the premises, the evidence is sufficiently stated in the opinion of this court.

On the 2nd of March, 1848, the chancellor (JOHNSON,) passed a decree dismissing the bill, from which the complainant appealed. The opinion of the chancellor, accompanying this decree, is reported in *1st Md. Ch. Decisions,* 120.

The cause was argued before DORSEY, C. J., CHAMBERS, SPENCE, MAGRUDER, MARTIN, and FRICK, J.

By THOS. S. ALEXANDER, for the appellant, and
By R. J. BRENT and NEILSON POE, for the appellees.

DORSEY, C. J., delivered the opinion of this court.

That an oral contract for the sale and purchase of the lands, mentioned in the proceedings in this cause, existed prior to the 1st day of June, 1845, and that it never has been abandoned or rescinded by the concurrence of both parties, we regard as

fully and satisfactorily established by the proof in the record before us. And it is equally clear, that a compliance with the terms and condition of this contract, did not take place at the time anticipated by the parties, in consequence of the vendee's objections to the sufficiency of the vendors' title; which objections he promised to have removed in a very short time. That both parties being desirous that the property contracted for should not remain unoccupied and unproductive, during the time about to be consumed by the complainant in perfecting his title, the original contract being left unrescinded and unchanged, except as to the time for its consummation, entered into a subsidiary agreement, whereby it was stipulated, that the defendants should take immediate possession of the property purchased and hold it, as the tenant of *James Owings*, at the rate of $900 a year, until the objections to his title could be removed; which removal, it was the anticipation and understanding of the parties, could be effected in a very short time. This condition of the parties, with regard to possession, which commenced on the 1st of June, 1845, is satisfactorily proved by two witnesses, *Gambrill* and *Poe*, who, in our interpretation of the other proof in the cause, wholly stand uncontradicted. Complainant, after spending much more time than was anticipated, in efforts, (partially unavailing,) for the perfection of his title to the satisfaction of the defendants, received notice from them, in February, 1846, that unless a clear title in the complainant were made to appear, they would give up the contract and abandon the possession of the premises, which they accordingly did, about the 1st day of June, 1846. On the 20th of May, 1846, the present bill of complaint was filed against the defendants, to enforce the specific execution of the contract between them, alleging his ability to give a good title to the property purchased. The defendants having denied almost all the allegations in the bill, have pleaded the statute of frauds, and deny their obligation to accept the title which the plaintiff is able to give them. In proof of his ability to execute the requisite conveyance, the plaintiff has shown a title in *Richard Owings* for the *Guilford Mills*, by a deed exe-

cuted by *James Carey*, in 1799; and of his right to the adjoining lands, he exhibits the deed of their former owner, *Richard Odle*, to *Richard Owings* and *Isaac Paul*, as joint tenants in fee, dated in May, 1799. It appears by the proof in the cause, that the property mentioned in both those deeds was, before the year 1813, held, and the mill carried on for the benefit of *Richard Owings* and *Isaac Paul*, in the name of *"Owings and Paul."* That in or about the year 1813, *Richard Owings* sold out all his interest in the property to *Isaac Paul*, who thenceforth held and carried on the same, in his own name, until the 20th of April 1818, when *Isaac Paul* sold out all his interest in the premises to *Richard Owings*, and gave to him a paper, signed by *Paul* and attested by two witnesses, stating, that *Paul* had on that day agreed to take $5,000 for his right and interest in the *Guilford Mills* and the adjoining land, *"which is now bound by a judgment held by Mr. Richard Owings, and under execution for the same."* And it was also proved by the said subscribing witnesses, that it was the agreement between the said *Richard Owings* and *Isaac Paul*, that the $5,000 were to be credited on the judgments which *Richard Owings* had against *Isaac Paul;* which credit was then given in *Paul's* presence, and *Samuel Brown, Jr.*, one of the subscribing witnesses, who was the security of *Paul*, paid to *Richard Owings* the balance due on the judgment. In consequence of this sale, *Paul*, in less than a month afterwards, delivered the possession of the property to *Richard Owings*, who, with those claiming under him, have ever since been in the possession and enjoyment thereof. It does not appear that *Richard Owings* ever executed a deed to *Paul*, or *Paul* to *Richard Owings*. *Richard Owings* died about the year 1819, and *Paul* about the year 1826.

Assuming, then, that the complainant held all the title which *Richard Owings* would possess, had he lived till the present day, and continued in the uninterrupted possession and enjoyment of the *Guilford Mills* and the adjoining lands, has the plaintiff such a title as the defendants are bound to accept under the contract in this case, is the first question which presents

itself for our determination? Had the adjoining lands, the one hundred and twenty-seven acres, which were conveyed by *Richard Odle* to *Richard Owings* and *Isaac Paul*, been conveyed to *Richard Owings* only, as the *Guilford Mills* had been by *Carey*, this question ought to be answered in the affirmative. Because no belief can, rationally, be entertained for a moment, that a court of equity, under any aspect in which the fact and circumstances of the case could be brought before it, could sanction the claim of the heirs of *Isaac Paul* in attempting to assert an equitable title to the property in controversy. In respect to their claim of legal title, it could not be pretended that they had any.

But the deed from *Odle* did not transfer the one hundred and twenty-seven acres of land adjoining the *Guilford Mills* to *Richard Owings* only, but to *Richard Owings* and *Isaac Paul*, as joint tenants in fee; and *Paul*, by right of survivorship, became, at law, the sole owner in fee of the land covered by the deed from *Odle*, and, at law, so continued, notwithstanding the unregistered contracts which had, from time to time, been entered into between him and *Richard Owings*. It is apparent, therefore, that *James Owings*, apart from the title claimed by him from long continued possession and the statute of limitations, has, at law, in the adjoining lands, no title. Under the contract with *James Owings*, the defendants, upon performance on their part, had a right to demand, and were not bound to accept any thing short of an unincumbered legal estate in fee. If authorities be requisite for such a proposition, they may be found in 2 *Sug. Vend.*, 139, where it is said, "if the contract is general, it amounts to an undertaking for the conveyance of a legal estate; and if the seller have no more than an equitable one, the contract is not binding upon the purchaser at law, nor, as we have seen, in equity, if the seller cannot procure the legal title:" and in the opinion of *Chief Justice Marshall*, in *Garnett, &c., vs. Mason, et al.*, 1 *Call*, 368, who says: "Both on principle and authority, I think it very clear, that a specific performance will not be decreed on the application of the vendor, unless his ability to make such

a title, as he has agreed to make, be unquestionable." "He had a right to expect an unincumbered estate in fee-simple would be conveyed to him." The proviso in the quotation from *Sug. Vend.,* "if the seller cannot procure the legal title," can be of no avail to the plaintiff. The case before us, is not that of a vendee going into a court of equity to be discharged from the obligation of performing his contract, on the ground that the vendor has but an equitable title, where the court will withhold the relief sought, until the vendor has an opportunity of proceeding in chancery to convert his equitable into a legal title. But it is the case of a vendor, who, (as is assumed,) has gone into equity, to render his title perfect at law, has failed to do so, and dismissed his proceedings for that purpose, and turns round and files his bill in chancery to coerce the specific performance of his contract, and to compel the vendees to accept his title in its then condition.

In behalf of the plaintiff it is alleged, that the possession held by him and those under whom he claims, since the contract, in April 1818, between *Richard Owings* and *Isaac Paul,* vests in the plaintiff a clear and unquestionable legal title, which the defendants are bound to accept. In 1 *Hopkins Ch. R.,* 436, *Seymour vs. De Lancey, et al.,* on a bill filed for the specific performance of a contract for the sale of land, it was held, that a "title by adverse possession for twenty-five years would be sufficient, if established, to preclude all other questions." In 2 *Sug. Vend.,* 125, we find it stated, that "in a case where a close called the '*Croyle,*' had always been known by that name, and had been possessed by the seller and his ancestors as part of the estate sold, but no mention was made of it in the deeds by name, and all the other lands were particularly described, the court considered the evidence of title to be merely that of long possession, and held that the purchaser was not bound to accept the title." And the case of *Barnwall vs. Harris,* 1 *Taunt.,* 430, sustains the principle, that a purchaser is not bound to accept a title, dependent for its establishment on oral testimony, resting in the peculiar knowledge of a single witness. Without attempting to recon-

cile these authorities, apparently somewhat in conflict; or contending, that no case can arise in which a vendee would be required to accept a vendor's title, resting entirely for its sustentation on his adverse, uninterrupted and notorious possession for upwards of twenty years, this court will content itself in saying, that the plaintiff in this cause has not shewn himself so entitled to the lands sold, as to authorise a court of equity to decree the specific performance of the contract, and to coerce the defendants to accept the title of the vendor in the condition in which it is offered.

The facts upon which the appellant asserts the sufficiency of his legal title, are the following paper, and the evidence of the subscribing witnesses thereto. and the evidence of subsequent continuous possession. The paper is in the following terms:

"*April* 20*th*, 1818.

I this day have agreed to take $5,000 for my right and interest for *Guilford Mills*, which is now bound by a judgment held by *Mr. Richard Owings*, and under execution for the same, and all the equitable right, title and interest I have in the land adjoining, which shall be clear of dower.

Isaac Paul."

"*Samuel Brown, Jr., Basil Owings.*"

This paper of itself, if capable of perpetual preservation, cannot be regarded, either at law or in equity, as transferring any title to the property mentioned therein to *Richard Owings* or any body else; it is nothing more than the written declaration of *Isaac Paul*, that he had on that day agreed to take for it the sum of money he named. But that *Richard Owings*, or any other person, was in treaty for its purchase, or had agreed to become its purchaser, is a fact of which the paper, *per se*, furnishes no evidence. The paper alone, as a contract, has no operation, and its character, as such, is only shewn by the testimony of the two subscribing witnesses, who proved that it was intended as an agreement of sale between *Isaac Paul* and *Richard Owings*; and that the $5,000 were to be credited on judgments of *Richard Owings* against *Isaac Paul*,

under which the property was taken in execution and about to be sold; that the credit was forthwith given accordingly, and the possession of the property, with the key of the mills, was delivered to *Richard Owings* by *Paul*, before the 9th of May, 1818. That *Richard Owings*, and those claiming under him, had ever since been in possession, was proved as well by the attesting as other witnesses. Upon this statement of facts, it is contended on the part of the plaintiff, that under the aforegoing agreement, from the time of the delivery of possession by *Paul*, in May, 1818, till the month of June, 1845, the possession of the plaintiff, and those under whom he claims, was known to *Paul*, was held adversely, and must be deemed sufficient evidence to prevent the successful prosecution of any proceedings, either at law or in equity, which those claiming under *Isaac Paul* might hereafter institute for the recovery of the property in question, or any portion of it. If all the facts detailed in the testimony of the subscribing witnesses, in relation to the agreement of April, 1818, between *Paul* and *Richard Owings*, were, like the possession, matters of notoriety, resting in the knowledge of the neighborhood in which they transpired, so as to be readily susceptible of proof, in the event of future litigation between the heirs of *Paul* and these defendants, the present appeal, to the discretion of the court of chancery, would be far stronger than it is in the attitude in which it is now presented. But such is not the character of the testimony now relied on. The material and most important facts to which the subscribing witnesses have testified, and which are mainly relied on by the plaintiff, appear to rest exclusively in their individual knowledge. With their decease, (and one of them it is said no longer exists,) all means of establishing the important facts to which they deposed are lost. Looking to the precarious duration of the proof on which the title of the plaintiff depends, to the fact that he filed a bill in chancery against the heirs of *Paul*, to procure from them a conveyance by which his title at law was to be perfected, and afterwards dismissed it; and to the additional fact, that on the records of the court in which the judgments against *Paul* were rendered,

no entry of the credit of $5,000 has been made, could a court of equity, having a due regard to the claims that might arise from the heirs of *Paul*, upon the death of the remaining attesting witness, compel the defendants to accept a title, the continuance of which is so contingent and uncertain? We think not.

It has been insisted by the defendants, that they cannot be required to receive the title proffered them by the plaintiff, because there is a suit now pending against him in the court of chancery, (commenced since the bill now before us was filed,) by one *Zachariah Poulton*, for the recovery of the property, the subject of controversy in this case, in which he alleged, that on the 9th of May, 1818, he purchased the same of *Richard Owings*, and gave his eleven promissory notes, each for the sum of $1,000, was immediately put into possession thereof by *Richard Owings*, who gave a bond of conveyance therefor; and that he continued in the full possession and enjoyment of his purchase until the year 1830, when he was wrongfully dispossessed, by a fraudulent combination between the plaintiff and *Richard Iglehart*, the sheriff of *Anne Arundel* county, they pretending that there had been a sale of the property to the plaintiff, under one or more writs of *fieri facias*, upon judgments against *Poulton*, at the suit of *Samuel* and *James Owings*, executors of *Richard Owings*. The answer of *James Owings* swore away all the equity of the bill, and the answer is abundantly sustained by the testimony before us. In addition to the exhibition of the sheriff's deed, the judgments and executions under which the property was sold, the oral testimony most satisfactorily shews, that the property was sold by the sheriff, at a *bona fide*, public and fair sale, at which *Poulton* was present, made no objection to it, and soon after, voluntarily, gave full possession to *James Owings*, which he and those claiming under him, have ever since uninterruptedly held. The question thence arises, is the pendency of this suit, under such circumstances, a sufficient ground for the refusal of a court of equity to compel the defendants to execute their contract? We do not so regard it. If it were so, it would estab-

lish a most unjust and inconvenient principle, by which an unscrupulous vendee might always evade the performance of his contract, by inducing a factitious claimant to institute proceedings against the vendor, at law or in equity, for the recovery of the property sold, or to establish some pretended lien upon it, after the vendor had filed his bill for the specific execution of the contract. That the mere commencement of a suit, for the recovery of the whole or a part of the land sold, after the filing of a bill for the specific execution of the contract of sale, is not, of itself, sufficient to prevent the vendees being decreed to accept the title; provided it appears to the satisfaction of the court, that the suit so commenced cannot be successfully prosecuted. See the case of *Osbaldiston vs. Askew*, 1 *Russell*, 160. In 2 *Sug. Vend.*, 124, it is stated, that "it is not a conclusive objection to a title, that a third party has filed a bill against the seller, claiming a right to the estate, but the nature of the adverse claim will be examined into." If this be done, the claim asserted by *Poulton* in his bill in chancery, under the circumstances disclosed in the record before us, furnishes no ground against decreeing a specific performance of the contract sought to be enforced against the defendants. It being manifest, that *Poulton's* entire interest in the property in dispute, was legally sold and conveyed to the plaintiff.

The purchase made by *James Owings* of the sheriff of *Anne Arundel* county, who sold *Zachariah Poulton's* interest in the *Guilford Mills* and the adjoining lands, under two writs of *fieri facias*, issued on judgments obtained against him by the executors of *Richard Owings*, being the only title which the plaintiff professes to possess, or to be able to give to the defendants, we are necessarily led to the inquiry as to the nature and character of that title. The executors having issued executions against *Zachariah Poulton*, the only power thereby communicated to the sheriff, or which he could exercise under them, in reference to the property in question, was to seize and sell the interest and estate of *Poulton* therein. What was that interest? An equitable title derived from *Richard Owings*, under a bond of conveyance, and payment of part of the

purchase money.  The legal title he could not have bought, because *Poulton* never possessed it, and, consequently, he could not derive it from any deed which the sheriff had authority to execute.  And the equitable title, thus purchased by the plaintiff, was held by him, subject to an unquestionable lien for the balance of the purchase money due by *Poulton* to the executors of *Richard Owings*.  Conceding, then, that *Richard Owings* was possessed of a legal estate in the property sold to *Poulton*, at the time of the sale, which is the most favorable assumption that can be made for the plaintiff, his title being purely equitable, the defendants were not bound to accept it, and, *a fortiori*, were they not bound to receive it, until disencumbered of such a lien as that which attached to it.  Had they accepted it, and, to obtain a legal title, had filed a bill in chancery against the heirs of *Richard Owings*, the chancellor would not have recognised them as having any standing before him, but upon their paying or offering to pay the balance of the purchase money due by *Poulton*.

But the defendants could not be compelled specifically to perform the contract on another ground.  The contract not having been reduced to writing, and the statute of frauds being relied on in the answer, as a bar to the relief sought by the bill, it was the incumbent duty of the plaintiff, before he could obtain a decree for specific execution, to prove the act of part performance charged in the bill, it being the only means by which the bar of the statute could be evaded.  This act of part performance, viz.: the entering by the defendants into possession, under the contract of the premises purchased, the plaintiff having wholly failed to prove, even if his title were free from all exceptions, to a decree for a specific execution of the contract, he has not shown himself entitled.

The only remaining reason assigned for the reversal of the decree of the chancellor, is, that it did not award to the plaintiff the rent to which, by the proof, he has shown himself to be entitled.  In not decreeing such an allowance the chancellor did not err, because the subsidiary contract, which warranted the allowance, was not averred in the bill.  It is true, as con-

tended for in the argument for the appellees, that in an action at law, the rent might be sued for and recovered, and that for that reason the plaintiff suffers no loss by its non-allowance by the chancellor. But the institution of such suit now by the plaintiff, would be a fruitless experiment, the statute of limitations being a flat bar to such an action. As the rent in question is justly due to the plaintiff, and might have been decreed to him, had the appropriate averments and prayer been inserted in the bill, this court, believing that justice will not be attained, either by an affirmance or reversal of the decree of the chancellor, will sign an order remanding this case to the court of chancery, pursuant to the 6th sec. of the act of 1832, ch. 302, that the plaintiff, by an amendment of his pleadings, may place himself in a situation to obtain the relief indicated in the aforegoing opinion, and that such further proceedings may be had therein as the nature of the case may require.

<div align="right">

CAUSE REMANDED

UNDER ACT OF 1832.