## William H. Hoyt

*v.*

## George W. Tuxbury *et al.*

70 331
27a 283
70 331
132 618
70 331
144 225
70 331
147 326
70 331
152 364
70 331
157 494
70 331
177 303
70 331
181 640

1. Agency—*ratification of sale made without authority.* Although an agent contracts for the sale of land without sufficient authority from the owner, yet, if the latter, through another agent duly authorized, ratifies the same, and makes a tender of a conveyance in pursuance of such contract, it will be binding on him.

2. Specific performance—*objections to title as an excuse for delay in performing contract to purchase.* Where there was a judgment of record against a former owner of a tract of land sold, but which was in fact satisfied, though the satisfaction not entered of record, and a third party was in possession of a part of the land as a mere squatter, and the purchaser, when tendered a deed, refused to accept the same and comply on his part for the reasons stated, it was *held*, on bill by the purchaser, afterwards filed, for a specific performance, that, if the objections to the title were well founded and urged in good faith, the purchaser was excusable for not performing at the time of the tender, but if they were urged in bad faith, he could not be excused for the delay occasioned in the performance on his part.

3. A purchaser of real estate can not be compelled to take a doubtful title, which may expose him to the expense and hazard of litigation.

4. Same—*not a matter of right.* A party can not, as a matter of right, call upon a court of equity to specifically enforce the performance of a contract, but the exercise of the power rests in the sound discretion of the court, in view of the terms of the contract and the surrounding circumstances.

5. Same—*party asking, must show his readiness to perform.* A party seeking the specific performance of a contract for the sale of land, must show that he has always been ready, willing and eager to perform on his part.

6. Same—*delay in accepting the title offered.* Where the purchaser of land has an option to avoid the contract for objections to the title, any delay in deciding whether he will accept the same, will defeat his right to a specific performance.

7. Where the purchase of land is made upon condition the title is found good, the purchaser is only entitled to a reasonable time in which to determine whether he will take the title the vendor has, or reject it. He can not keep the contract open indefinitely, so as to avail of a rise in the value of the property, or relieve himself in case of a depreciation.

8. Same—*when time of performing is of the essence of the contract.* Time may be implied as essential in a contract, from the nature of the subject matter of the contract. If the thing sold be of greater or less value, according to the effluxion of time, then time is of the essence of the contract, and must be observed in equity as well as at law.

9. Amendment—*to bill in chancery, discretionary.* The granting or refusing leave to amend a bill in chancery after the hearing and before a final decision, being purely a matter of discretion, can not be assigned for error.

Appeal from the Circuit Court of Cook county; the Hon. E. S. Williams, Judge, presiding.

This was a bill for specific performance, filed by William H. Hoyt against George W. Tuxbury, George W. Gerrish and George M. Gibson. The opinion of the court states the necessary facts.

Messrs. Monroe, Bisbee & Gibbs, and Messrs. Herbert & Quick, for the appellant.

Messrs. Miller & Frost, for the appellees.

Mr. Justice Scholfield delivered the opinion of the Court:

This appeal is prosecuted for the purpose of reversing a decree dismissing a bill for the specific performance of the following contract:

"Real Estate Office of R. Fowler & Co.,
No. 13 Exchange Place,
Chicago, *February* 17, 1869.

Received of Wm. H. Hoyt $1000, to be applied as part payment towards the purchase of the following described real

estate, viz: the south half of the south-east quarter of section
15 of town 38, range 14, it being in the south half of Hugh
Maher's sub-division, excepting block 29 and east half of
block 28, (which was previously sold, it being 72½ acres,)
hereby bargained and sold, the said the above property being
blocks 17 to 27, and half of 28, and 30 to 32, for the price
and sum of $72,500, $17,500 more to be paid on the delivery
of a good and sufficient deed of conveyance for the same,
within 20 days from date, or as much sooner thereafter as the
deed is ready for delivery, with release of dower, after the
title has been examined and found good.   And the balance
to be paid as follows: one-fourth, or $18,000, to be paid in
one year, same amount in two years from date, and like
amount in three years from date, all at seven per cent.

To be secured by mortgage or trust deed on the premises;
and should the title to the property not prove good, then this
$1000 to be refunded.

But should the said William H. Hoyt fail or refuse to per-
form this contract at the time and in the manner above
specified, then the above $1000 shall be forfeited by him as
liquidated damages.

(Signed)            R. FOWLER & Co.,     [SEAL.]
                   Agents for GEO. W. TUXBURY.
                   W. H. HOYT.            [SEAL.]"

Evidence was introduced on the hearing in the court below,
tending to show that R. Fowler & Co. executed the contract
without sufficient authority from Tuxbury, and that objection
is urged in the printed argument filed on behalf of appellees,
with some apparent earnestness.  We are not inclined to
think that the question is of controlling importance, since it
is conceded that Tuxbury subsequently authorized Gerrish to
make the necessary investigation, and if he should then be
of opinion that the contract price of the land was a proper
one, and it was for Tuxbury's interest to carry the contract
into effect, to do so in his name, and that, pursuant to such

authority, Gerrish, after making satisfactory investigation, indorsed the following upon the original contract:

· " CHICAGO, *May* 13, 1869.

I do hereby agree, and by these presents do agree, as agent of George W. Tuxbury, and, further, I do agree that the contract made by R. Fowler & Co. shall be carried out as stipulated in said contract. Received from William H. Hoyt $500, as further payment on land sold by within contract.

G. W. GERRISH. "

Gerrish, at the time of making this indorsement, in addition to the authority specially conferred upon him by Tuxbury, was equitably interested, to some extent, in the property which is the subject of the contract, and both he and Tuxbury, subsequent to this indorsement, acted in a manner to fully justify appellant in the belief of the validity of the contract when thus ratified.

The allegations in the bill upon which the claim for specific performance is based, are, in brief: that, as appears from the abstract of title furnished appellant by Tuxbury, and, in fact, at the time Tuxbury tendered appellant a deed for the property, in attempted pursuance of the terms of the contract, there was a judgment of several thousand dollars, which appeared of record upon the records of the Circuit Court of the United States for the Northern District of Illinois, which was then unsatisfied and a lien upon the property; and that one Drake was then in possession of a portion of the property, and claimed an interest therein; that he then notified Tuxbury of these objections to his title, and offered to pay the $17,500 stipulated by the contract to be paid upon the delivery of the deed, as soon as the objections should be removed and the title to the property be perfected; that neither Tuxbury nor Gerrish took any steps to remove these incumbrances or to perfect the title to the property, or offered to refund the $1500 which appellant had paid on the contract; that afterwards, and prior to ———— 1869, appellant, at his

own expense, caused the title to the land to be investigated, and found that the judgment had been paid, although not satisfied of record, and that, as he believed, the claim of Drake was merely that of a squatter, and could be defeated; that on the ———— day of ————, 1869, appellant informed Tuxbury that he had investigated the title to the property, and was then ready and willing to accept his deed, make the payment and execute the notes and mortgage, etc., as provided by the contract, but that Tuxbury then refused to deliver his deed.

. The defense is based upon the grounds that Tuxbury's deed was tendered in good faith, and that, had it been accepted by the appellant, it would have invested him with a good title to the property; that the judgment claimed to have been a lien on the property, had been paid, and that Drake claimed no interest in the property, and was, at any time, ready to surrender possession to the owner; that appellant was unable to comply with his contract, and urged his objections to the title in bad faith, and that, by his failure to comply with the contract, Tuxbury was justified in treating it as abandoned.

The bill was not filed until the 7th day of September, 1872, over three years and a-half after the making of the contract, and some three months less than that period after its ratification by Gerrish.

The bill is filed by the appellant in his own behalf, and also on behalf and for the benefit of his grantees and those to whom he has contracted and agreed to sell certain parts of the property, one of whom is Hugh Maher.

It appears, from the evidence, that, in May, 1869, and a short time subsequent to the making of the contract with Fowler and Co., a deed for the property in controversy was tendered the appellant by Miller, who was the attorney of Tuxbury. This occurred at Miller's office, in Chicago, in the presence of several witnesses, whose evidence as to what then transpired is preserved in the record. Although there are

some discrepancies in their different recollections, these facts seem to be sufficiently established: Miller tendered Tuxbury's deed for the property in controversy, to the appellant, informing him that he was prepared to carry out the contract, and demanded the cash payment to be made by appellant, and that the deferred payments be secured in accordance with the terms of the contract. Appellant declined receiving the deed, or to take any steps towards complying with the contract, alleging, through his attorney, Peabody, who was then present, as his reason for declining to receive the deed, that Tuxbury had not complied with his contract; that there was an unsatisfied judgment against Hugh Maher, who had formerly been the owner of the property, which was a lien upon it, and also that one Drake occupied a part of the land, and claimed some interest in it.

If these objections were well founded, and urged in good faith, appellant was certainly justified in refusing to accept the deed and perform his part of the contract, for a purchaser can not be compelled to take a doubtful title, which will expose him to the expense and hazard of litigation. Fry on Specific Performance, § 580; 2 Chitty on Contracts, (11 Am. Ed.) p. 1496. If, however, they were urged in bad faith, it is equally certain that the appellant can not be excused for the delay thereby occasioned in the performance of the contract.

The evidence fails to clearly satisfy us that these objections were either well founded or urged in good faith by the appellant.

The judgment alluded to as being a lien on the property, it appears, was obtained by Crawford and others against Edw. Kelley and Hugh Maher, in the Circuit Court of the United States for the Northern District of Illinois, on the 13th day of April, 1864, for $6033.49, and was assigned to one James Roberts, on the 4th day of March, 1867. Roberts was the brother-in-law of Maher, and in his employ, at monthly wages, at the time the judgment was assigned to him, and, during the

time, he was the ostensible owner of it. It seems, during this time, to have been completely under Maher's control. Although he swears that it was not discharged until the 14th of January, 1873, he, nevertheless, admits that he had a release of the judgment as to the property now in controversy, in 1869, to be used in a negotiation then pending between him and Gerrish, but which he claims to have subsequently destroyed. He says he obtained releases of this judgment as to particular property, "but not to wipe out the whole judgment;" that Roberts made frequent releases of the judgment as to particular property, for him; "that he did so as many as forty or fifty times." It does not appear that anything had to be paid for these releases, or that the slightest effort was made to enforce the payment of the judgment. When it was Maher's interest that it should be a lien, it was a lien, and when it was his interest to have particular property disincumbered of it, the desired releases were ready.

It appears, moreover, that, at the time appellant urged the objection of the existence of this lien, he knew of its real character, and had then made an arrangement by which it was to be released.

Fowler testifies, that, at the time he delivered the abstract of title to appellant, he thinks he told him this judgment had been paid. As nearly as we can gather from the evidence, about two months after the making of the contract with Fowler & Co., and which was before the deed was tendered appellant at Miller's office, appellant entered into a contract with Maher, whereby he contracted and agreed to convey to Maher the undivided half of the north 40 acres, upon the same terms upon which he himself was to receive the property from Tuxbury. Appellant says: "I went to Maher, because I wanted to get the judgment out of the way, and he held a contract for the land with Gerrish. He said he did not own the judgment—some friend did, and he could control it, and if I would give him an interest, he would see it canceled. After that, I went to him three or four times. He refused to

22—70TH ILL.

get it canceled until he got a settlement with Gerrish, when he promised to do it. And just before I wrote to Tuxbury, he told me the judgment was satisfied. This was the next year after the meeting in Miller's office."

The objection urged against the deed on account of the claim of Drake, is not sustained by a clear preponderance of evidence.

It is not shown that Drake had a shadow or claim of title, in fact, to the property, other than what is to be inferred from a mere naked possession of a part of it.

It is true, appellant and his son swear that Drake made claim to the property, but this is denied positively by Drake, who swears that he had no claim to the property, and that he was, at any time, ready to surrender its possession to the rightful owner, and that he so informed appellant.

Hancock swears that he saw Drake, in the fall of 1869, at the instance of Gerrish, and that, being informed by him that he would move off the property, and not defeat the sale, he communicated this fact to appellant, who then, he says, fell back on Peabody's objections to the title, which had been urged when the deed was tendered, at Miller's office. But, waiving this point, and assuming that the objections to the deed were well founded, and urged in good faith, does the evidence show that appellant is entitled to the relief he seeks?

The rule, time and again announced by this court, is, that a party can not call, as a matter of right, upon a court of equity to specifically enforce the performance of a contract; that its exercise rests in the sound discretion of the court, in view of the terms of the contract of the parties, and surrounding circumstances. A party demanding its exercise, is bound to show he himself has always been ready, willing and eager to perform on his part. *Phelps* v. *The Illinois Central Railroad Company et al.* 63 Ill. 468; *Stow* v. *Russell,* 36 id. 18; *Board of Supervisors* v. *Henneberry,* 41 id. 179.

"Where the contract is in anywise unilateral," says Fry, in his work on Specific Performance, § 732, " as, for instance,

in the case of an option to purchase a right of renewal, or any other condition in favor of one party and not of the other, then any delay in the party in whose favor the contract is binding, is looked at with especial strictness. On this principle, the delay of the purchaser in deciding whether he will or not accept the title, is an injustice, because the purchaser can enforce the contract against the vendor, whether the title be good or bad, whereas the vendor can only do so in case of a good title." So, also, it is again said, by the same author, in § 713: "Time may be implied as essential in a contract, from the nature of the subject matter with which the parties are dealing." "If, therefore," said Mr. Baron Alderson, "the thing sold be of greater or lesser value, according to the effluxion of time, it is manifest that time is of the essence of the contract, and a stipulation as to time must then be literally complied with in equity as well as at law."

In *McKay* v. *Carrington,* 1 McLean, 59, this principle is applied to a contract for the sale of real estate, the court saying: " When the property has not materially changed in value, and the circumstances of the parties in relation to it remain substantially as they were when the contract was made, or was made to have been performed, time is seldom considered material. But where a specific execution of the contract will give the purchaser property greatly deteriorated from the value it bore when he should have received it, it would be unjust to compel him to receive it. Chancery will never interpose its powers, under such circumstances, to carry the contract into effect."

And this must obviously apply with equal force in cases, like the present, where the purchaser is seeking specific performance, and the property has, pending the delay of the purchaser to determine whether he will take the title the vendor has, greatly increased in value. See, also, *Schmidt* v. *Livingston,* 3 Edwards (Ch'y), 213; *Williams' Admrs.* v. *Stark,* 2 B. Monroe, 196.

It appears, from the evidence, that appellant was a real estate broker, and the contract made by him for the purchase of the property in controversy, was for the purpose of speculation. The location of the property was deemed favorable for that purpose. Its proximity to a contemplated public park, and the prospective improvements incident thereto, afforded reasonable ground for the expectation that it would materially and speedily appreciate in value. This, however, necessarily depended on a number of contingencies, and time alone could fully determine to what extent the expectations would be realized. There was a reasonable prospect of gain from the purchase, at the contract price, but, at the same time, a possibility of loss.

By the terms of the contract, if the title was found to be not good, appellant was to have back the $1000 paid at the execution of the contract. If he failed to comply with the contract, he was to forfeit the $1000 as liquidated damages. Appellant might elect to take the title, notwithstanding his objections to it, but Tuxbury could not compel him to do so.

The title which appellant now asks to have decreed him, is the same title which he rejected at Miller's office. Between that time and the time he claims to have written to Tuxbury, notifying him that he would take the title, which he states to have been from one year and a half to two years, he does not pretend that he was willing to receive this title, or that he offered to comply with his part of the contract, except upon condition that Peabody's objections should be removed. It is shown, by the testimony of Tuxbury, that the title papers remained in the possession of Miller for over a year after the deed was first tendered, and that appellant might, at any time during that period, have had the title by simply complying with the terms of his contract. Appellant knew that Miller was acting as the attorney of Tuxbury in this matter; he acknowledges to having been tendered the deed by him, twice, and that he, on both occasions, rejected it. Nor does he assert that he ever actually tendered Tuxbury, or any one

acting for him, the amount due by the terms of the contract, and demanded of him the title he was able to convey, until the 30th day of May, 1872, over three years after the ratification of the contract by Gerrish, and when, as he swears, the property had increased in value from $1000 to $2000 or $3000 per acre.

It is clear, upon the principles before quoted, that appellant was only entitled to a reasonable time in which to determine whether he would take the title Tuxbury had, or reject it, and that he could not keep the trade suspended indefinitely, so as to avail of a rise in the value of the property, or relieve himself from loss by rescinding the contract, in the event of its depreciation, and the court below was justified in finding that Tuxbury was authorized to treat the contract as abandoned by appellant.

There is an apparent conflict in the evidence, whether Gerrish tendered appellant the $1500 which he had advanced on the contract, and notified him that he would thenceforth treat the contract as rescinded. We say "apparent conflict," because it is more in the form of the expression than in the substance. Gerrish swears positively that he tendered him the $1500 back, and notified him the contract was rescinded. Appellant claims that Gerrish offered to pay him the $1500, to buy him out. He does not deny that he had refused to accept the deed which had been tendered him. He made no tender of money, and offer to carry out his part of the contract, at the time. He knew that Gerrish was acting as the agent of Tuxbury, and must have known that the object in offering to pay him the $1500, was, to get rid of his claim. Whether it was called a re-payment or a buying out, the substance was precisely the same. It was to give the money back to him which he had advanced on the contract, and end his claim to the property. He had an opportunity to have his money back, and declined to take it, and he could not have been ignorant that it was the intention of Tuxbury, at least thenceforth, to treat the contract as abandoned.

342 HOYT *v.* TUXBURY *et al.* [Sept. T.

Opinion of the Court.

We are in doubt, from the evidence, whether appellant was, in fact, able to comply with his part of the contract, when the deed was tendered him in Miller's office, in 1869, or for a long time subsequent thereto. He testifies, in general terms, to his ability, but, in specifying the sources from which he was to raise the money, he mentions a contract for the sale of a portion of this identical property to Wadsworth and Peabody, from which he was to raise from $7000 to $9000, but that contract could not, manifestly, have been enforced. By it, he obligated himself to convey a title free from all incumbrances, and take mortgages for the deferred payments, "each block to be mortgaged for its proportionate share of said deferred payments." By his contract with Tuxbury, the deferred payments were to be secured by mortgage or trust deed on the entire premises. No agreement is shown whereby Tuxbury consented to so modify his contract as to make the performance of the terms of the Wadsworth and Peabody contract possible. The $88,500, too, actually tendered on the 30th of May, 1872, was raised by contracts for the sale of this same property. Had this property declined, instead of increased, in value, it is not clear, from the evidence, from what source appellant could have raised the money wherewith to make a tender.

But, from a careful consideration of all the evidence, we are unable to say, in any view, that the court below erred in dismissing appellant's bill. The impression which the evidence produces on our minds, is, that it was appellant's intention to perform the contract only in case it suited his interest, and he is, therefore, not entitled to the assistance of a court of equity. The burden was upon him to clearly show such facts as entitle him to equitable relief, and this he has failed to do.

The objection, that the court refused to allow certain amendments to be made after the hearing and final decision of the case in the court below, can not be assigned for error.

Whether the amendment should be made, or not, rested purely in the discretion of the court.

We do not consider, however, that these amendments, if they had been made in apt time, could have materially affected the result. The title sought by the bill is not shown to be other or different from the one tendered at Miller's office, in May, 1869. The imperfections existing in the assignment of the mortgage, at that time, are not shown to have been subsequently corrected, and however valid the objection might have been as a defense to a suit for specific performance against the appellant, we fail to perceive how it can avail him in a suit for specific performance against Tuxbury, in which he proposes to take the title, notwithstanding this objection. It certainly conferred no greater right than did the objections named in the bill, to wait three years before finally determining to take the title, notwithstanding the objections.

Perceiving no error in the decree of the court below, it is affirmed.

*Decree affirmed.*