JAMES B. CLOSE

*v.*

JOHN R. STUYVESANT.

| | |
|---|---|
| 132 | 607 |
| 147 | 356 |
| 132 | 607 |
| 51a | 143 |
| 132 | 607 |
| 157 | 233 |
| 132 | 607 |
| 177 | 303 |

*Filed at Mt. Vernon May 10, 1890.*

1. PUBLIC LANDS—*certificate of entry—under pre-emption and homestead laws—effect given to the certificate.* Certificates of entry under the homestead or pre-emption laws, if obtained in good faith and after a due compliance with all the requirements of those laws, will vest in the holder a complete equitable title to the lands therein named. Their certificate will vest in them the absolute right, even as against the United States, to the possession, control and enjoyment of the land, and their title is such as they will have a perfect right to convey.

2. SAME — *pre-emption and homestead — limited to actual settlers— fraudulent entries.* It was the policy of Congress in passing the pre-emption and homestead laws, to confine their benefits to actual settlers upon the public lands, and to prohibit all contracts and undertakings entered into prior to the issuing of the final certificate of entry, by which the benefit of the entry would inure directly or indirectly to any third party.

3. All assignments and transfers of the pre-emption right are declared to be null and void, and any person claiming the benefit of such pre-emption, before he shall be allowed to enter the lands pre-empted, shall make oath before the register or receiver of the land district, stating that he has not settled upon and improved such lands to sell the same on speculation, but in good faith to appropriate them to his own exclusive use, and that he has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person whatever, by which the title he may acquire shall inure, in whole or in part, to the benefit of any person other than himself.

4. In an answer to a bill in chancery to enforce the specific performance of a contract for the conveyance of certain lands which had been entered by the vendors under the pre-emption and homestead laws of the United States, it was alleged that the several parties who made the entries of the lands did so by the procurement and for the benefit of the complainant; that they resided on said lands only for a sufficient time to make a merely colorable and formal compliance with the law, and then filed their final proofs, and obtained certificates of entry, and immediately conveyed the tracts entered by them, respectively, to the complainant, in pursuance of a previous agreement and undertaking between him and them, made prior to the date of the final proof: *Held,*

that these allegations showed that the entries were in violation of law, and a fraud upon the United States, and a defense to the bill.

5. SPECIFIC PERFORMANCE—*burden of proof—as to character of title— alleged fraudulent entries under pre-emption and homestead laws.* On bill for specific performance of a contract of sale by the vendor of certain lands which he had obtained from pre-emptors and homesteaders, where the answer sets up that the titles so obtained are fraudulent and in violation of the laws of the United States, the defendant, in making such defense, will not take upon himself the burden of proving that the entries were fraudulent, by evidence which would justify a court having jurisdiction of that question to pronounce them fraudulent, and cancel them for that reason. All the defendant is bound to show is, that the title of the complainant is doubtful.

6. SAME—*right of purchaser to a good title.* Every purchaser of land has a right to demand a title which shall put him in all reasonable security against loss or annoyance by litigation. He should have a title which shall enable him not only to hold his land, but to hold it in peace, and if he wishes to sell it, to be reasonably sure that no flaw will come up to disturb its market value.

7. EVIDENCE — *limited to the particular purpose for which offered.* Where documents are competent evidence for one purpose and incompetent for all others, the party offering them has a right to protect himself against their use as evidence upon any other question, by limiting his offer to the specific purpose for which they are competent. When offered in that manner the other party obtains no right to use them as proofs upon any other issue. If they are offered and received generally, doubtless a different rule would apply.

8. On an issue as to whether certificates of entry issued to settlers on the public lands, and their transfers, are not fraudulent, the party questioning the title offered in evidence certified copies of the final proofs made by the settlers, in which each makes the affidavit prescribed by the pre-emption or homestead laws. They were not offered as proof of the facts therein stated, but the offer was limited to the purpose of showing the mode in which the settlers complied with the law: *Held,* that the copies were competent evidence only for the purpose for which they were offered, and that neither party had a right to resort to them as proof of any other fact.

9. JUDICIAL NOTICE—*statutes of other States.* This court can not take judicial notice of the statute laws of another State.

APPEAL from the Superior Court of Cook county; the Hon. EGBERT JAMIESON, Judge, presiding.

This was a bill in chancery, brought by John R. Stuyvesant against James B. Close, for the specific performance of the following contract:

"STUYVESANT, *July 22, 1887.*

"*James B. Close*—I will exchange my Osborne county ranch, consisting of four thousand three hundred and twenty (4320) acres, clear of all incumbrances, for your equities in Wabash avenue, Congress street and Lytle street properties in Chicago, incumbrances as follows: On Wabash avenue, mortgage for thirty-eight thousand two hundred and fifty dollars ($38,250); on Lytle street, mortgage for four thousand five hundred dollars ($4500); on Congress street, mortgage for eight thousand dollars ($8000),—taxes for 1887 to be paid by parties owning properties previous to August 1, 1887. J. R. Stuyvesant pays taxes for 1887 on Osborne county ranch, and J. B. Close pays 1887 taxes on Chicago property.

"I agree that J. B. Close shall collect all receipts coming from his Chicago property up to April 30, 1888, he agreeing to pay all expenses coming due on same property up to April 30, 1888, providing that I can have the use of said ranch for wintering my stock until May 20, 1888, with such crops and hay as may be upon the ranch at this present time.

JNO. R. STUYVESANT."

"I agree to above terms, and accept the exchange.

JAMES B. CLOSE."

The lands designated in the contract as the complainant's "Osborne County Ranch" consist of 4320 acres of land situate in Osborne county, in the State of Kansas. There is no controversy as to the identity or description, either of said lands, or of the several pieces of property in Chicago to be given in exchange therefor by the defendant.

The bill describes the several tracts of land included in the ranch by their legal subdivisions, and alleges that the ranch, as was well known to the defendant, was substantially enclosed, and occupied by the complainant; that the defendant was in

39—132 ILL.

possession of and had an equitable interest in the several pieces of property in Chicago in the contract mentioned, said property being subject to certain mortgages as therein stated; that the complainant was ready and willing to make said exchange and carry out said agreement in good faith on his part, and had so notified the defendant, but that the defendant refused to carry out or perform the agreement, and that he had waived a tender to him by the complainant of a deed or deeds of the ranch property.

The answer admits the execution of the agreement as alleged; also that at the date of the agreement, the defendant was the owner of said pieces of property in Chicago, except that on Wabash avenue, and in that he had a leasehold interest; that the ranch embraced the several tracts of land described in the bill; that the defendant waived a tender to him by the complainant of a deed or deeds of said lands, and that the complainant was ready and willing to execute to the defendant deeds purporting to convey to him the lands included in the ranch; that at the date of the agreement the ranch was substantially enclosed and occupied by the complainant, and that such fact was then well known to the defendant.

The answer denies that, at the date of the agreement, or at any time since, the complainant was able to perform the terms and conditions of the agreement on his part, or that then or at any time since he was the owner of said ranch, and alleges that at the date of the agreement, and at the time the delivery of deeds by the complainant to the defendant was waived, the title to certain portions of the ranch, including in all about 1700 acres, was in the United States; that said lands to which the defendant had no title were of the value of $30,000, and formed a principal part of the consideration for which the defendant was induced to enter into said contract; that said several tracts of land were entered at the Land Office in the district in which they were situate, under the homestead and pre-emption laws, by divers persons, by direction and for the

benefit of the complainant; that said entries were in violation of said laws and void; that the parties who, by the procurement of the complainant, made said entries, having resided on said lands only for a sufficient time to make a merely colorable and formal compliance with the law, filed their final proofs and obtained from the register and receiver final certificates of entry under the homestead and pre-emption laws, and then immediately conveyed the several tracts entered by them respectively to the complainant, and that such conveyances were executed in pursuance of a previous agreement and understanding with the complainant, made and entered into prior to the date of their final proofs; that no patent has been issued by the United States for any of said lands, nor is the complainant or either of his grantors entitled to such patent, but all of said certificates of entry are subject to cancellation by the Commissioner of the General Land Office as being in violation of the homestead and pre-emption laws, and in fraud of the United States, and that if a patent or patents should issue on said entries or any of them, such patent or patents would be subject to cancellation by a court of equity at the suit of the United States for the reason above stated.

The answer further alleges that prior to the making of said agreement, the complainant represented to the defendant that all of said lands, with the exception of one or two eighty acre tracts, had been patented, and that defendant, believing and relying upon such representation, was induced to and did enter into said agreement; that after the agreement was made and the complainant had submitted to the defendant an abstract of title to said ranch, the defendant for the first time discovered that the several tracts above mentioned were unpatented, and on further inquiry he ascertained that long before the date of either of said entries, the complainant entered into and took possession of the whole of said ranch, and included in his enclosure all of the tracts aforesaid, and it appearing from such abstract of title that the tracts entered as aforesaid were

conveyed to the complainant by divers parties by deeds exe-cuted within a few days after final proofs made by the vendors, complainant's attention was called to the circumstance, and it was agreed upon and understood by and between complainant and defendant that it had a suspicious look, and that in view of it, and of the fact that the complainant had entered into pos-session prior to the date of the entries, defendant was justified in suspecting that said conveyances were made in pursuance of an understanding and agreement entered into prior to the date of final proofs between the complainant and the parties who made the entries, and that such entries and final proofs were made for the complainant's benefit, and in violation of the homestead and pre-emption laws; and that it was further understood and agreed by and between the complainant and defendant that it would be unjust and inequitable to force such title upon the defendant without giving him acceptable security to indemnify him against a failure of title; that the negotiation between the complainant and defendant was broken off, and the contract rescinded by the defendant, because of the continued failure of the complainant to furnish acceptable security to indemnify him against such failure of title.

A replication was filed, and the cause coming on to be heard on pleadings and proofs, a decree was rendered specific-ally enforcing said contract, and from that decree the defend-ant has appealed to this court. The further facts in the case are sufficiently stated in the opinion of the court.

Messrs. MONK & ELLIOTT, for the appellant:

Defendant can not be required to accept a doubtful title. Fry on Specific Per. secs. 576, 577; 1 Sugden on Vendors, 339; *Stapleton* v. *Scott*, 16 Ves. 272; *Lowes* v. *Lusk*, 14 id. 547; *Brown* v. *Cannon*, 5 Gilm. 174.

Certificates of the register and receiver are not conclusive, but preliminary, only, and subject to review by the depart-

ment. Nor can a purchaser, before patent, claim protection as a *bona fide* purchaser.

The department at Washington has power to set aside a fraudulent entry allowed by the local officers, and its judgment on the facts constituting fraud is conclusive upon all other tribunals. The entries now awaiting final action in the. general land office at Washington, confer only an inchoate right, subject to approval or rejection by the officers of the Interior Department, and a purchaser before patent takes subject to their action. U. S. Rev. Stat. secs. 441, 445, 2263, 2273 ; *Barnard* v. *Ashley,* 18 How. 43 ; *Harkness* v. *Underhill,* 1 Black, 316 ; *Root* v. *Shields,* 1 Woodw. 394 ; *Brown* v. *Childs,* 10 Pet. 177 ; *Fenn* v. *Holmes,* 21 How. 481 ; *Schemier* v. *Connelly,* 23 id. 235 ; *Langdon* v. *Sherwood,* 124 U. S. 74 ; *Guy* v. *Stockton,* 8 Minn. 529 ; *Randall* v. *Edert,* 7 id. 450 ; *Carroll* v. *Spafford,* 3 How. 451 ; *Robbins* v. *Bunn,* 54 Ill. 48 ; *Moore* v. *Robbins,* 96 U. S. 530 ; Story's Eq. Jur. sec. 1502.

The entries were fraudulent in their inception. Collusion between Stuyvesant and the entry-men, though, not necessary to defeat the entries, is clearly established by the evidence. *Black* v. *Wright,* 9 Ired. L. 497 ; *Brown* v. *Schock,* 77 Pa. St. 177 ; *Curlewis* v. *Canfield,* 12 B. 814 ; *Baldwin* v. *Whitcomb,* 71 Mo. 651.

The affidavit of the pre-emptors, filed in the department, is entitled to no additional weight, because introduced by defendant. *Yundt* v. *Hartrunft,* 41 Ill. 9.

A purchase in self-defense is not equivalent to a plea of a *bona fide* purchaser. · *Roseman* v. *Miller,* 84 Ill. 297 ; · *Brown* v. *Welch,* 18 id. 343.

The question of title is governed, not by the laws of Kansas or of Illinois, but by the rules of decision which prevail in the general land office, where entries are now awaiting final examination. Tried by that test, the entries are fatally defective. *Darcey* v. *McCarthy,* 33 Kan. 722 ; *Lee* v. *Johnson,* 116 U. S. 48 ; *Quimby* v. *Conland,* 104 id. 420 ; *Murray* v. *Ellis,* 112 Pa. 485.

Mr. E. B. McCagg, and Mr. W. I. Culver, for the appellee:

Appellee has title to the ranch lands. A contract for the sale of land is governed by the law of *situs*. Sedgwick & Wait on Trial of Titles to Land, sec. 823 ; Story on Conflict of Laws, sec. 363, *et seq.; Bissell* v. *Terry,* 69 Ill. 190 ; *United States* v. *Crosby,* 7 Cranch, 115 ; *Clark* v. *Graham,* 6 Wheat. 577 ; *McCormick* v. *Sullivan,* 10 id. 192 ; *Brine* v. *Insurance Co.* 96 U. S. 622.

Under the laws of Kansas a register's certificate is proof of title equivalent to a patent. Compiled Laws of Kansas, 1885, p. 651, sec. 383 ; *Bruner* v. *Manlove,* 1 Scam. 156 ; *Jackson* v. *Wilcox,* id. 344 ; *Isaacs* v. *Steel,* 3 id. 97 ; *Whiteside* v. *Divers,* 4 id. 336 ; *Brill* v. *Stiles,* 35 Ill. 305 ; *Carroll* v. *Safford,* 3 How. 441 ; *Johnson* v. *Towsley,* 13 Wall. 72 ; *Smith* v. *Ewing,* 11 Saw. 56 ; *Camp* v. *Smith,* 2 Minn. 155 ; *Moyer* v. *McCullough,* 1 Ind. 239 ; *McDowell* v. *Morgan,* 28 Ill. 528 ; *Cornelius* v. *Kissell,* 58 Wis. 237 ; *Sillyman* v. *King,* 36 Iowa, 207.

It is not in the power of the commissioner of the general land office to declare an entry void. *Brill* v. *Stiles,* 35 Ill. 305 ; *Rogers* v. *Brent,* 5 Gilm. 573 ; *Carroll* v. *Safford,* 3 How. 441 ; *Perry* v. *O'Hanlon,* 11 Mo. 585.

The doubt, whether of law or fact, sufficient to reject a title, must be a grave and reasonable one. Chitty on Contracts, p. 1497 ; *Sturtevant* v. *Jaques,* 96 Mass. 523 ; *Osbalderton* v. *Askew,* 1 Russ. 160.

The legal presumption in favor of appellee's title can not be rebutted in this proceeding in the manner attempted.

The register's certificates can not be assailed in this proceeding on the ground that they were issued on insufficient or false evidence. *Smelting Co.* v. *Kemp,* 104 U. S. 636 ; *Beard* v. *Federy,* 3 Wall. 478 ; *Moffat* v. *United States,* 112 U. S. 30 ; *United States* v. *Minor,* 114 id. 233.

If a state of facts exists upon which a patent might issue, the law presumes, as against collateral attacks, that the facts existed. *Beard* v. *Federy,* 3 Wall. 478 ; *Moore* v. *Wilkinson,*

13 Cal. 478; *United States* v. *Minor,* 114 U. S. 233; *Bohall* v. *Dilla,* id. 47; *Lee* v. *Johnson,* 116 id. 48.

The evidence shows the appellee to have purchased in good faith and for value, and this protects him.

The testimony taken does not deny to the appellee the relief he prays. *Myers* v. *Croft,* 13 Wall. 291; *Maxwell Land Grant case,* 121 U. S. 325; *United States* v. *Throckmorton,* 98 id. 61.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

The pleadings and evidence on the part of the complainant are sufficient, *prima facie,* to entitle him to a decree for the specific performance of the contract alleged in the bill, and the questions to be considered therefore are those which arise upon the case made by the defendant. The contract sought to be specifically enforced is for the exchange by the defendant of his interest in certain pieces of real property in Chicago for about 4320 acres of land in Osborne county, Kansas, known as the complainant's "Osborne County Ranch." There is no controversy as to the identity, description or title of the defendant's Chicago property, the only questions litigated being those which pertain to the validity of the complainant's title to a portion of the Kansas lands. It is admitted that the complainant is the owner in fee and able to convey a good title to 2400 acres of said lands, but it is insisted that as to the residue he has no title which the defendant should be compelled to accept as a consideration for the performance of his contract to convey to the complainant his Chicago property.

The complainant offered no evidence tending to prove the representation by the complainant alleged in the answer, that all the lands embraced in the ranch, with the exception of one or two eighty-acre tracts, had been patented, nor any evidence tending to prove the averments of the answer in relation to a subsequent agreement or understanding between him and the complainant that the circumstances under which the latter obtained title to a portion of his lands were suspicious, and

that it would be unjust and inequitable to force said lands upon the defendant without giving him suitable security against a failure of title. The defense then is based solely upon the evidence tending to show defects or infirmities in the complainant's title.

It appears that 1920 acres of said land had been conveyed to the complainant by warranty deeds executed by various parties who had entered the same under the provisions of the pre-emption and homestead laws of the United States, and obtained proper certificates of entry from the register and receiver of the local land office. Of this land, 1280 acres were entered by nine different purchasers under the pre-emption laws and 640 acres by four different parties under the homestead laws. At the time the bill was filed no patents seem to have been issued to the purchasers for any portion of this land, but at the date of the decree patents had been issued for three of the tracts entered under the homestead laws and the fourth had been approved by the proper officers of the General Land Office and sent to the recorder's division, which had charge of the issuing of patents, to be patented. Of the nine tracts entered under the pre-emption law, two had been approved for patents and sent to the recorder's division to be patented, and the residue, containing 960 acres in all, were in the pre-emption division awaiting examination.

It can not be doubted that these certificates of entry, if obtained in good faith and after a due compliance with all the requirements of the pre-emption and homestead laws, vested in the holders of the certificates a complete equitable title to the lands. Their certificates vested in them the absolute right, even as against the United States, to the possession, control and enjoyment of the land, and their title was one which they had a perfect right, at any time after their certificates were issued, to convey to others. *Myers* v. *Croft*, 13 Wall. 291; *Robbins* v. *Bunn*, 54 Ill. 48; *Coleman* v. *Allen*, 75 Mo. 332; *Knight* v. *Leary*, 54 Wis. 459. In this State, under our stat-

ute, such certificates are held to be evidence of legal title, and for most purposes to be equivalent to a patent, and it is suggested that a similar effect is given to them by the statutes of Kansas. How that may be we can not judicially know, as the record furnishes us no evidence as to what the laws of Kansas are, and we are not permitted to take judicial knowledge of the laws of another State.

The defense, however, rests upon the allegation that said certificates of entry were obtained in fraud of the pre-emption and homestead laws of the United States. It is alleged that the several parties who made said entries did so by the procurement and for the benefit of the complainant; that they resided on said lands only for a sufficient time to make a merely colorable and formal compliance with the law, and then filed their final proofs and obtained certificates of entry, and immediately conveyed the tracts entered by them respectively to the complainant in pursuance of a previous agreement and understanding between him and them made prior to the date of the final proofs.

There can be no doubt, if these allegations are sustained by the evidence, that the entries were in violation of law and a fraud upon the United States. It was clearly the policy of Congress, in passing the pre-emption and homestead laws, to confine the benefits of those laws to actual settlers upon the public lands, and to prohibit all contracts and understandings entered into prior to the issuing of the final certificates of entry, by which the benefit of the entry would inure directly or indirectly to any third party. All assignments and transfers of the pre-emption right are declared to be null and void, and it is provided that any person claiming the benefit of such pre-emption, before he shall be allowed to enter the lands preempted, shall make oath before the register or receiver of the land district in which the land is situated, stating, among other things, that he had not settled upon and improved such land to sell the same on speculation, but in good faith to ap-

propriate it to his own exclusive use, and that he had not directly or indirectly made any agreement or contract in any way or manner with any person whatever, by which the title which he might acquire from the Government of the United States should inure, in whole or in part, to the benefit of any person other than himself. Rev. Stat. of U. S. secs. 2262, 2263.

The decision of the case then must turn upon the effect to be given to the evidence tending to sustain the defendant's allegation of fraud. In considering that question it should be remembered that the defendant does not take upon himself the burden of proving that the entries were fraudulent by evidence which would justify a court, having jurisdiction of that question, in pronouncing them fraudulent and cancelling them for that reason. All the defendant is bound to show is that the title which the complainant is prepared to tender him is doubtful. "It is sufficient if the facts throw a cloud on the title and render it suspicious in the minds of reasonable men." *Snyder* v. *Spaulding,* 57 Ill. 480. "A purchaser can not be compelled to take a doubtful title, which will expose him to the expense and hazard of litigation." *Hoyt* v. *Tuxbury,* 70 Ill. 331. In *Pyrke* v. *Waddingham,* 10 Hare, 1, which was a bill by a vendor for a specific performance, the question as to title turned upon the construction to be given to a particular will, and the Vice Chancellor was strongly of the opinion that the title was good; but as he was unable to found his opinion upon any general rule of law, or upon reasoning so conclusive as to satisfy him that other competent persons might not entertain a different opinion, or that the purchaser taking the title might not be exposed to substantial and not merely idle litigation, he refused a decree of specific performance. It was there held that a doubtful title which a purchaser will not be compelled to accept, is not only a title upon which the court entertains doubts, but includes also a title which, although the court has a favorable opinion of it, yet may reasonably and fairly be questioned

in the opinion of other competent persons ; for the court has no means of binding the question as against adverse claimants, or of indemnifying the purchaser, if its own opinion in favor of the title should turn out not to be well founded ; that if doubts as to the title arise upon a question connected with the general law, the court is to judge whether the general law on the point is or is not settled ; and if it is not, or if the doubts as to the title may be affected by extrinsic circumstances, which neither the purchaser nor the court can satisfactorily investigate, specific performance will be denied. The rule thus laid down as to the species of doubt which ought to prevent a court from enforcing specific performance was adopted in the later case of *Mullings* v. *Trinder,* L. R. 10 Equity, 449.

' It is not easy to lay down any precise rule as to the amount of doubt necessary to induce a court of equity to decline a specific performance. It is said in Sugden on Vendors, 385, that, to enable equity to enforce a specific performance against a purchaser, "the title to the estate ought, like Cæsar's wife, to be free even from suspicion," although perhaps the rule does not seem to be usually enforced with quite the degree of strictness which this statement would imply, the doctrine generally adopted being that there must be something more than mere speculation, theory or possibility. There is, however, a very uniform concurrence in the rule, that where there is a reasonable donbt as to the validity of the title, the court will not specifically enforce a contract of purchase.

In *Sturtevant* v. *Jaques,* 14 Allen, 523, which was a bill for specific performance, the court said "In order to maintain this bill, the plaintiffs must prove that the title they offer to convey is good beyond a reasonable doubt, and will not expose the defendant to litigation." In *Swain* v. *Fidelity Ins. Co.* 54 Penn. St. 455, it is said : "It is a well settled rule in equity, not to enforce specific performance of a contract in favor of a vendor of real estate, unless he is able to offer a marketable title which is beyond reasonable uncertainty." So, in *Swayne* v. *Lyon,*

67 Penn. St. 436, the rule is laid down as follows : "It is well and wisely settled, that under a contract for the sale of real estate, the vendee has the right not only to have conveyed to him a good but an indubitable title. Only such a title is deemed marketable ; for otherwise the purchaser may be buying a lawsuit, which will be a very serious loss to him both of time and money, even if he ultimately succeeds. Hence it has been often held that a title is not marketable where it exposes the party holding it to litigation."

In *Speakman* v. *Forepaugh*, 44 Penn. St. 363, this question is discussed as follows : "When a vendor goes into a court of equity and asks for a decree that his vendee by articles shall specifically perform the agreement, he is bound to offer a title that is more than what the court may pronounce good. That is sufficient for a court of law, but it is an invariable rule in chancery that a purchaser shall not be compelled to accept a doubtful title, or what in some of the cases is called an unmarketable title. And every title is doubtful which invites and exposes the party holding it to litigation. In the opinion of the court it may be good, but if its validity depends upon some facts resting in the knowledge of some party or writings not before the court; if there be a color of an outstanding title which may prove substantial, though there is not enough in evidence to enable the chancellor to say that it is so, a purchaser will not be held to take it, and encounter the hazard of litigation with an adverse claimant."

"Formerly the practice was to decide for or against the validity of the title, and compel the purchaser to take it as good or dismiss the bill because it was held bad. But this rule was objected to as absurd and unjust, and it has long since been changed. A court of equity will not now compel a purchaser to accept a title which is so doubtful that it may expose him to litigation, though the court may believe it good. For the decree of the court is *in personam* and not *in rem*, and it binds only those who are parties to the suit, and those claiming

through them, and in no way decides the question as against the rest of the world. If therefore there is a reasonable chance that some third person may raise a question against the owner of the estate, after the completion of the contract, the court will not compel him to accept it." *Richmond* v. *Gray*, 3 Allen, 25. See also, *Owings* v. *Baldwin*, 8 Gill, 337; *Butler* v. *O'Hear*, 1 Desau. Eq. 382; Bispham's Eq. sec. 378; Pomeroy's Specif. Perform. of Cont. secs. 201-208; Waterman's Specif. Perform. of Cont. secs. 409-413; Fry's Specif. Perform. of Cont. sec. 859 *et seq.*

Let us consider the evidence in the light of these well recognized principles, and see whether it is sufficient to throw a reasonable doubt upon the validity of the complainant's title, so as to make it the duty of a court of equity to refuse a decree of specific performance. Sometime before any of the parties who made the entries in question went upon said land for the purpose of making pre-emptions or establishing homesteads, the complainant had acquired title to about 2400 acres of the land in question, with a view of establishing thereon a cattle ranch. When and in what manner he obtained his title to that portion of his ranch is not shown, nor is it material. The land he thus owned lay in two separate bodies of somewhat irregular shapes, from one half mile to one mile apart, the land lying between them, and much if not all the land lying adjacent being government land. None of said government land was subject to private entry, and the only mode in which the complainant could obtain title thereto was by conveyance from others who might enter it under the pre-emption and homestead laws. Most of the entries of land by the parties in question were made near the same time, or at least during a period of less than four months. Thus, all the entries by pre-emption and one of the homestead entries were made during the period extending from July 9, 1884, to the 30th day of the following October. One homestead entry was made on the 24th day of the preceding April, one May 10, 1885, and the remaining one

was made about November 15, 1886, by a party who had pre-viously entered one of said tracts under the pre-emption laws. The lands thus entered embraced all the lands lying between the two tracts already owned by the complainant, except one forty-acre tract, and other lands adjoining and in the imme-diate vicinity, thus forming, with the exception of two tracts separated a short distance from the main body, a continuous and relatively compáct body of land. One tract of 320 acres lay eighty rods, and one of 160 acres one hundred and sixty rods, from the main body. The plat of said lands which the parties put in evidence shows that said detached tracts lie on or near streams of water, which may explain the circumstance of their being selected instead of the lands immediately ad-joining the main tract.

Several of the settlers are shown to have been in the employ of the complainant. While said settlements were being made, or very shortly thereafter, the complainant built a fence upon the external boundary of the entire ranch, thus enclosing his own land and that of the settlers in one enclosure, and it seems that from that time he had practically the possession and use of the entire enclosure for pasturing and herding his cattle, and so far as appears, this was wholly without objection on the part of the settlers. It is true they seem to have culti-vated a small portion of their respective tracts, but it does not appear, except perhaps in one instance, that the pieces of land cultivated were in any way fenced off or otherwise protected from the complainant's cattle, and in most cases the inference from the evidence is very strong that no crops were harvested. A small house was built upon each tract, but in some instances at least, they appear to have been built by workmen in the complainant's employ, and the evidence tends to show, that the houses so built were paid for by money furnished by the complainant.

The settlers as a rule seem to have been poor persons, and presumably without the necessary funds to improve and pay

for their land, but it appears that in every case where the settlement was made under the pre-emption law, the settler, instead of availing himself of the long term of credit which the law gives, entered and paid for his land at the expiration of the shortest period at which such entry could be made, and in the cases where the settlements were made under the homestead law, each settler, instead of occupying his land for the period of five years and then obtaining his patent without paying the government for the land, as under the law he might have done, availed himself, at the expiration of six months from the date of his settlement, of the privilege given by the homestead law of commuting his homestead right for a cash entry.   In some cases the evidence furnishes a ground for a reasonable inference that the money with which the land was entered and paid for was furnished directly by the complainant.

But doubtless the most important circumstance shown by the evidence is, that every one of said settlers, almost immediately after obtaining their certificates of entry, conveyed their lands to the complainant.   Of these conveyances, one was made the day the certificate of entry was issued, one the second day thereafter, one in four days, two in five days, three in nine days, and the remaining five within a period not much longer.   There is some evidence tending to show that the prices paid by the complainant were much less than the fair cash value of the land after entry, thus giving some ground for the conclusion that the prices paid were made up of the government price and a reasonable compensation to the settlers for their services.

It is worthy of remark that circumstances similar to some of those above stated have received consideration by the Department of the General Government which has charge of the administration of the Land Laws, and have been held to have a tendency at least to show fraud in making the entries.   Thus, in Chrisinger's case, 12 Copp's Land Owner, 289, Mr. Secretary Lamar, in affirming a decision of the Commissioner of

the General Land Office sustaining a cancellation of a commuted homestead entry, said: "The proffer of commutation proof within the shortest possible period after entry, suggests naturally that the settler intended from the first to avail himself of his statutory right of purchase, and invites special scrutiny into his qualifications and compliance with the requirements of the law." The Commissioner of the General Land Office, in a letter of instruction to the Register and Receiver at Yankton, Dakota, said: "The selling of land soon after making proof, coupled with slight residence and meagre improvements, is evidence of the fact that the claimant did not take advantage of the homestead law for the purpose of securing a home, but in order to secure a tract of land for speculative purposes. Under these circumstances the claim can not be allowed." 12 Copp's L. O. 265. Again, in his letter of instruction to special agent Rowe, ib. 193, the Commissioner said: "If a settler abandons or sells his claim immediately after entry, or removes therefrom his house, or fails to cultivate the same, such acts are *prima facie* evidence of bad faith and speculative intent, and taken in connection with slight improvement and doubtful residence, will forfeit the residence entry."

While the foregoing are the opinions of mere ministerial officers, or at most of officers charged with the performance of *quasi* judicial functions, they are entitled to consideration because they express the views of those officers who are charged by law with the official responsibility of administering the Land Laws, and because they embody, as we may presume, the principles upon which the General Land Office will act in passing upon and either approving or rejecting the entries in question which appear to be still awaiting examination. If the circumstances under which said entries were made were such that, under the law as it is administered by the General Land Office, they are liable to rejection and cancellation, that liability alone is doubtless such defect of title as a court of equity ought not to compel the defendant to assume.

The complainant, it is true, introduced evidence tending to rebut the inferences to be drawn from the various facts above mentioned, the most important portion of which consists of his own testimony in which he denies having made any arrangement or agreement or of having had any understanding with any of the settlers before they made their final proofs, in relation to buying their lands.

Among the proofs offered by the defendant were also certified copies of the final proofs made by the settlers before the officers of the local land office, in which each made the affidavit prescribed by the pre-emption and homestead laws. These papers were offered, however, as the record recites, "not as proof of the facts therein stated, but for the purpose of showing what the witnesses testified to before the local officers." Some question is raised as to whether these affidavits should be considered as evidence of the truth of the statements therein made, notwithstanding the form of the offer. While the intention of the defendant in offering them to limit their effect to the purpose of showing the mode in which the settlers complied with the provisions of the law in relation to final proofs, is not stated with entire accuracy, yet the form of the offer is such that no one can mistake the defendant's intention to limit the evidence to that one purpose. For that purpose they were competent, but for no other. When documents are competent for one purpose and incompetent for all others, the party offering them has a right to protect himself against their use as evidence upon any other question by limiting his offer to the specific purpose for which they are competent. When offered in that manner, the other party obtains no right to use them as evidence upon any other issue. Had the affidavits in question been offered and received generally, probably a different rule would have been applied, but as the offer was made, they were clearly incompetent for any other purpose than that for which they were offered.

40—132 ILL.

If the complainant had desired to corroborate his own testimony by that of the settlers, he should have produced them in court or have taken their depositions, and under the circumstances, the entire absence of the testimony of the settlers lays a foundation for an inference unfavorable to him.

But, under the law applicable to the case, as is abundantly shown by the authorities above cited, we are not called upon to determine decisively whether the complainant's title is good or bad. It is enough that the circumstances were sufficient to throw upon it doubt and discredit, or, in other words, that there was evidence in any substantial degree tending to impeach it. "Titles may sometimes depend for their validity upon presumptions in reference to some collateral acts, facts or events which perhaps are incapable of proof by direct evidence, and the rule seems to be settled that a title sustained by such a presumption will be held free from doubt, and forced upon a vendee, whenever the circumstances of the case are such that, had it been pending before a jury, the judge would have directed them peremptorily to find the fact in accordance with the presumption; but the title will be held too doubtful to be forced upon the vendee, whenever the circumstances would have been submitted to the jury for them to find in conformity with or against the presumption." Pomeroy on Specific Perform. of Cont. sec. 205; Fry on Specific Perform. of Cont. sec. 871.

We are of the opinion that the decree is contrary to the evidence, and it will therefore be reversed and the cause will be remanded to the Superior Court for further proceedings with leave to either party to introduce further evidence if he shall be so advised.

*Decree reversed.*

Mr. JUSTICE CRAIG, dissenting.